**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MSG KNICKS, LLC and NEW YORK KNICKS, LLC,<br>Plaintiffs,<br>vs.<br>JOHN DOES 1-100, JANE DOES 1-100, and XYZ COMPANIES 1-100,<br>Defendants. | Case No.: 1-26-cv-9728<br>**COMPLAINT** |

Plaintiffs MSG Knicks, LLC, formerly MSG Sports, LLC ("MSG Knicks") and New York Knicks, LLC (collectively "Plaintiffs"), by and through their counsel Chiesa Shahinian & Giantomasi PC, complaining of Defendants herein, allege as follows:

## NATURE OF THE ACTION

1. This action arises under the Lanham Trademark Act of 1946, 15 U.S.C. § 1051 et seq. (the "Lanham Act"), New York General Business Law § 349, and unfair competition under New York common law.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over the claims herein pursuant to 28 U.S.C. §§ 1331 and 1338, and through the Court's pendent jurisdiction. Venue is proper under 28 U.S.C. § 1391 because Defendants have been and will be selling and distributing infringing merchandise in this district, and thus, are subject to personal jurisdiction in this district.

## PARTIES

3. Plaintiff New York Knicks, LLC is a wholly owned subsidiary of Plaintiff MSG Knicks.

4. Plaintiff New York Knicks, LLC is a limited liability company duly organized under the laws of the State of Delaware. New York Knicks, LLC owns the professional basketball team the New York Knicks (the "Knicks") of the National Basketball Association ("NBA"). New York Knicks, LLC is the sole owner of the names, logos, trademarks, and service marks (collectively, "Intellectual Property") associated with the Knicks, including the KNICKS, NEW YORK KNICKS, and NYK trademarks and service marks (collectively, the "KNICKS Trademarks").

5. The identities of Defendants, various John Does, Jane Does and XYZ Companies, are not presently known, and this Complaint will be amended to include the names of such individuals and entities when identified. Upon information and belief, Defendants were present at home games of the Knicks during the team's previous seasons, and Defendants were present at the Knicks' preseason and regular season home games played thus far during the Knicks current 2026-2027 season, which games are played at Madison Square Garden arena (the "MSG Arena") in New York City within this District. Specifically, Defendants were present at and around the MSG Arena during the Knicks' home games during the current 2026-2027 NBA season on October 12, October 15, October 20, October 25, October 27, and November 2, 2026. Upon information and belief, Defendants will again be present at and around the MSG Arena in this District before, during, and after the next home Knicks games, including but not limited to home games on November 10 and November 11, 2026 (the "Upcoming Games"). Defendants, therefore, are subject to this Court's jurisdiction.

## STATEMENT OF FACTS

### A. The Team

6. The Knicks are one of the most well-known and oldest professional sports teams of all time.

7. The Knicks were established and first began play in 1946 and have publicly and continuously used the KNICKS Trademarks since that time to identify the team.

8. The Knicks play all of their home preseason, regular season, and post-season games at the MSG Arena, which is located in Midtown Manhattan between 7th and 8th Avenues from 31st to 33rd Streets and is one of the most iconic and well-known arenas in the United States.

9. Throughout the years, and through the present, the Knicks have grown tremendously in popularity.

10. The Knicks regularly sell out their home games by reaching the MSG Arena's capacity of approximately 19,812 for basketball games. The Knicks saw average home attendance of 19,801 during the 2025-2026 regular season, for a total of more than 700,000 home game spectators that same season. The Knicks also sold out all of their 2026 home playoff games, for a total of more than 178,308 additional home game spectators during the Knicks' nine home playoff games.

11. During the 2025-2026 season (the Knicks' 80th season), the Knicks again advanced to the NBA Playoffs (for the fourth consecutive season) and won the NBA Championship – the team's third title in the franchise history. During their 2026 Playoff run, the Knicks won a franchise-record 13 straight playoff games, standing as the second-longest single-postseason winning streak in NBA history, and the team achieved the largest comeback in NBA Finals history. Last season, the Knicks became the first team to win the NBA Cup (the NBA's midseason

tournament), win a playoff series, make the NBA Finals, and win the NBA championship in the same season.

12. For the current 2026-2027 NBA season, the Knicks began pre-season games on October 5, 2026, and played three pre-season home games on October 8, October 12, and October 15, 2026. The Knicks regular season began with a home game on October 20, 2026, and ends on April 11, 2027. In addition, in the event the Knicks qualify for the NBA post-season, the Knicks potentially would play additional home games starting on April 13, 2027 (for the SoFi NBA Playoff Tournament) or April 17, 2027 (the first date of the NBA Playoffs) through the last game of the NBA Finals (which is scheduled to begin on or about June 1, 2027, and should conclude on or before June 30, 2027). The Knicks' pre-season, regular season, and post-season, which span October 5, 2026 through June 30, 2027, shall be referred to herein as the "2026-2027 Season."

**B. <u>The Intellectual Property</u>**

13. The KNICKS Trademarks have been used for decades to identify the Knicks as a professional basketball team in the NBA and to distinguish the Knicks from all other professional basketball teams. New York Knicks, LLC owns a number of Federal U.S. Trademark and Service Mark Registrations and Applications for the KNICKS Trademarks, including but not limited to those set forth on Schedule A hereto, several of which Registrations are incontestable in accordance with 15 U.S.C. § 1065.

14. New York Knicks, LLC and MSG Knicks have the right to control, and to delegate and approve, the manufacture, marketing, distribution, and sale of merchandise bearing the KNICKS Trademarks during the Knicks' home games in or around the vicinity of the MSG Arena throughout the entire 2026-2027 Season.

15. The merchandise that will be offered for sale by Plaintiffs at the Knicks' home games bearing the Knicks' respective Trademarks includes, without limitation, T-shirts, jerseys, sweatshirts, hats, accessories and other merchandise (collectively, the "Sports Merchandise"), which is manufactured under strict quality control standards designed to promote an image of quality of the Knicks and to ensure that the fans and customers who purchase said Sports Merchandise receive a quality product.

16. The Trademarks are extremely well-known to the public because of the great popularity of the Knicks throughout the United States, particularly in New York, the extensive media coverage of the Knicks, and the continuous, lengthy, and extensive prior use of the Trademarks in promotional and advertising programs, and on a variety of products and services for decades. These Trademarks are distinctive and have achieved secondary meaning to the public in that they identify products upon which they appear as sourced or sponsored by Plaintiffs.

**C. <u>The Bootlegging Activity</u>**

17. At the Knicks' home games, attendees may purchase team-related merchandise and memorabilia from Plaintiffs within and in the vicinity of the MSG Arena, i.e. the Sports Merchandise.

18. However, the great popularity of the Knicks, and the central location of the MSG Arena, generate the production and sale of substantial quantities of counterfeit merchandise, which are generally produced by large-scale professionals for distribution through largely anonymous and mobile middlemen and street vendors located around the exterior of the MSG Arena, and particularly its entrances and exits. Indeed, upon information and belief, Defendants have engaged, and will continue to engage, in the unauthorized manufacture, distribution, and sale of

inferior merchandise bearing the Trademarks (the "Bootleg Merchandise") in the vicinity of the MSG Arena during the Knicks games in the current 2026-2027 Season.

19. These middlemen normally appear before, during, and after home games, distribute their Bootleg Merchandise for cash and then disappear without detection.

20. They maintain no permanent business identities and take steps to cloak their activities, including by ignoring the requirement to obtain permits that regulate lawful street vending in Manhattan and around the MSG Arena. They use fake names and business addresses to avoid detection as the source of the Bootleg Merchandise.

21. The Bootleg Merchandise offered for sale by these street vendors bears the identical marks as the Sports Merchandise, which is intended to deceive the public and create the appearance that Defendants' illegal merchandise is sponsored by or originated with the Plaintiffs.

22. However, while the Bootleg Merchandise bears identical marks as the Sports Merchandise, it is of sub-par quality, as Defendants are not subject to the stringent quality control standards as the Sports Merchandise. Indeed, the Bootleg Merchandise is manufactured outside of Plaintiffs' knowledge and control, using unknown substances and materials, in unknown locations and with unknown manufacturing requirements and controls.

23. Recent investigations by Plaintiffs have revealed the intentional, knowing, wanton and reckless production, distribution, offering for sale, and sale of significant quantities of Bootleg Merchandise by Defendants at and around the MSG Arena prior to, during, and after Knicks home games during the current 2026-2027 Season.

24. This unlawful and hazardous activity by these vendors has been well documented by Plaintiffs during Knicks home games in the current 2026-2027 Season, and Plaintiffs believe

that Defendants will sell, or attempt to sell, Bootleg Merchandise at the Knicks' remaining games during the 2026-2027 Season, including during the Upcoming Games.

25. In fact, before, during and after home games during the 2026-2027 Season so far, including (without limitation) during Knicks games on October 12, October 15, October 20, October 25, October 27, and November 2, 2026, the Lead Investigator providing counterfeit authentication and coordination of security and identification of counterfeit merchandise for MSG Knicks and members of his security team ("MSG Security") observed counterfeiting activities around the MSG Arena, including individuals attempting to sell Bootleg Merchandise that was similar to legitimate, authorized Sports Merchandise being offered for sale by Plaintiffs, the exclusive on-site merchandisers at the Knicks' home games. MSG Security obtained samples of the Bootleg Merchandise and took photographs of some of the bootlegging activities at and in the vicinity of the MSG Arena during these games during the 2026-2027 Season.

26. Specifically, on October 12, 2026, during a preseason home game, within a two-block radius of the MSG Arena, MSG Security observed and photographed at least seven individuals selling Bootleg Merchandise, and MSG Security obtained samples of the Bootleg Merchandise.

27. On October 15, 2026, during a preseason home game, MSG Security observed and photographed at least ten individuals selling Bootleg Merchandise such as T-shirts and hats, and MSG Security obtained samples of the Bootleg Merchandise.

28. On October 20, 2026, during the Knicks first home game of the regular season, within a two-block radius of Madison Square Garden before, during, and after the game, MSG Security observed and photographed at least seven individuals selling Bootleg Merchandise, and MSG Security obtained samples of the Bootleg Merchandise.

29. On October 25, 2026, during a Knicks home game, within a two-block radius of Madison Square Garden before, during, and after the game, MSG Security observed and photographed at least twelve individuals selling Bootleg Merchandise, and MSG Security obtained samples of the Bootleg Merchandise. Notably, many of the individuals appeared to recognize MSG Security and immediately fled the area upon spotting MSG Security.

30. On October 27, 2026, during a Knicks home game, within a two-block radius of Madison Square Garden before, during, and after the game, MSG Security observed and photographed at least ten individuals selling Bootleg Merchandise, and MSG Security obtained samples of the Bootleg Merchandise.

31. On November 2, 2026, during a Knicks home game, MSG Security observed and photographed at least eight individuals selling Bootleg Merchandise, and MSG Security obtained samples of the Bootleg Merchandise.

32. Plaintiffs have also observed street vendors selling Bootleg Merchandise at Knicks games during prior seasons, and, in the case of the Knicks' historic 2026 run to the NBA Championship, MSG Security even observed street vendors selling Bootleg Merchandise within a two-block radius of Madison Square Garden before, during, and after official team watch parties for team's away games during the playoffs.

33. In short, Plaintiffs have documented the repeated and consistent existence of street vendors selling Bootleg Merchandise at Knicks home games during prior seasons and during the games played so far this season, which activity will undoubtedly continue through the 2026-2027 Season, including at the Upcoming Games.

34. This unauthorized sale of Bootleg Merchandise by Defendants is likely to cause confusion to the public, to cause mistake, and to deceive, in that the members of the public

attending Knicks home games purchasing the Bootleg Merchandise will believe that it is licensed by, sponsored by, approved by, or affiliated with the Plaintiffs and the Knicks, when it is not.

35. The unauthorized sale of the Bootleg Merchandise also damages the goodwill of the Plaintiffs that is embodied by the Trademarks. Indeed, because the home games of the Knicks are showcase events, the sale of inferior quality Bootleg Merchandise will cause immediate and irreparable damage to the goodwill and reputation of Plaintiffs.

36. As set forth above, Bootleg Merchandise is produced by professional infringers who concentrate on large-scale sporting events, such as the Knicks' home games (and, last season, watch parties during some Playoff away games). These professional infringers recognize the illegality of their conduct and thwart Plaintiffs' investigative efforts by concealing their true identities, using middlemen, or transferring the merchandise upon detection. As such, the only way to combat this problem is to seize the goods at or before the point of sale.

37. The counterfeiters at the home games are aware of the illegality of their conduct, and thus, they act in concert with anonymous distributors so that it is extremely difficult, if not impossible, to identify the source of any given Bootleg Merchandise that is sold in the vicinity of the MSG Arena during the games. Because the counterfeiters lack a definitive or permanent business location, notice to the producers and vendors of the Bootleg Merchandise in the vicinity of the MSG Arena during Knicks games is impractical and fruitless.

## D. Safety Concerns

38. Each Knicks home game attracts multiple thousands of fans and spectators in the center of midtown Manhattan on a city block roughly equivalent to the size of two football fields.

39. These multiple thousands of attendees are in addition to the significant number of pedestrians that are regularly walking and/or travelling around the MSG Arena, which, as set forth above, is located in one of the busiest and most crowded areas of Manhattan.

40. The number of spectators at each home game, compounded with the substantial regular foot traffic, naturally results in significant congestion around the MSG Arena before, during, and immediately after each of the Knicks' home games.

41. As such, while the MSG Arena has at least eight separate entrances from and exits to the surrounding sidewalks, the ingress and egress of the arena by these thousands of spectators before and after games or other official team events like watch parties for away games must be done in an orderly fashion and unimpeded by unnecessary outside obstructions.

42. Defendant vendors of Bootleg Merchandise, in addition to unlawfully selling unauthorized Bootleg Merchandise, by their very presence, create undue outside obstructions for the spectators of the MSG Arena and its vicinity.

43. Indeed, Defendant bootleggers use bags, strollers, tables and/or boxes to store, carry, and display the Bootleg Merchandise, which create undue obstacles for pedestrians outside of the MSG Arena in what is already a very congested area before, during and after games.

44. Moreover, Defendants are often aggressive and belligerent towards pedestrians and attendees of the games when attempting to sell their Bootleg Merchandise, oftentimes preventing said individuals from freely traversing and accessing the arena and its immediate surroundings.

45. This inevitably creates a dangerous impediment to the ingress and egress of the MSG Arena by the tens of thousands of spectators who attend Knicks home games.

46. Defendants' activities have caused and will continue to cause Plaintiffs grave and irreparable harm. Unless restrained and enjoined, and unless the Bootleg Merchandise is seized,

without notice, Defendants will persist in their activities and conceal and destroy evidence, causing Plaintiffs further irreparable harm before any Defendants can be heard in opposition.

47. Because the acts of Defendants will continue in the future unless restrained, Plaintiffs have no adequate remedy at law.

48. Defendants' actions constitute willful misconduct, malice, fraud, wantonness, oppression and/or entire want of case, which raises the presumption of conscious indifference to consequences.

**FIRST CAUSE OF ACTION**
**(Federal Trademark Counterfeiting – 15 U.S.C. §§ 1114-1117)**

49. Plaintiffs repeat and reallege each allegation set forth in the above paragraphs as if set forth fully herein.

50. The Trademarks and the goodwill of the businesses associated with them are of great value and incalculable value, are famous and highly distinctive, and have become universally accepted in the public mind with (i) authentic merchandise upon which the Trademarks appear, and (ii) the related services of highest quality and reputation.

51. Without the Plaintiffs' authorization or consent, and with knowledge of the Plaintiffs' well-known prior rights in the Trademarks, and with knowledge that Defendants' Bootleg Merchandise bears marks which are intentionally identical to, or imitations of, the Trademarks, Defendants have reproduced, counterfeited, copied, and sold Bootleg Merchandise to the consuming public in direct competition with Plaintiffs' sale of genuine merchandise, in or affecting interstate commerce.

52. Defendants have counterfeited and infringed the Trademarks. Defendants' use of the Trademarks is without Plaintiffs' authorization or consent.

53. Defendants' use of copies or simulations of the Trademarks on Bootleg

Merchandise and duplicates of the Sports Merchandise is likely to cause and is causing confusion, mistake, and deception among the general purchasing public as to the origin of the Bootleg Merchandise, and is likely to deceive the public into believing the Bootleg Merchandise originates from, is associated with, or is otherwise authorized by Plaintiffs, all to the damage and detriment of the Plaintiffs' reputations, goodwill, and sales. Accordingly, Defendants are using reproductions, counterfeits, and copies of the federally registered Trademarks in violation of Section 32 of the Lanham Act, l5 U.S.C. § l 114.

54. Defendants' conduct exploits the goodwill and reputation associated with Plaintiffs, with the Knicks, and with the Trademarks.

55. Plaintiffs have no control over the quality of Defendants' Bootleg Merchandise. Because of the very real likelihood of confusion as to the source of Defendants' Bootleg Merchandise, Plaintiffs' reputation and valuable goodwill in their Trademarks and the Sports Merchandise is irreparably harmed by Defendants' unscrupulous tactics.

56. Defendants' unauthorized use of the Trademarks as set forth above has resulted, and will continue to result, in Defendants unfairly benefitting and profiting from Plaintiffs' advertising, promotion, reputation, and Trademarks, to the substantial and irreparable injury of the public, Plaintiffs, the Knicks, the Trademarks, and the substantial goodwill represented thereby.

57. Defendants' acts demonstrate an intentional, willful, and malicious intent to trade on the goodwill associated with Trademarks to Plaintiffs' great and irreparable injury.

58. Defendants' acts have caused and will continue to cause the Plaintiffs great and irreparable harm.

59. Unless restrained and enjoined by this Court, Defendants will persist in their activities, thereby causing Plaintiffs irreparable harm.

60. Plaintiffs have no adequate remedy at law.

61. Plaintiffs are, therefore, entitled to injunctive relief pursuant to 15 U.S.C. § 1116(a).

62. For each act of infringement, Plaintiffs are entitled to recover Defendants' profits pursuant to 15 U.S.C. § 1117(a).

63. Defendants' acts of counterfeiting as alleged herein have been undertaken with knowledge of Plaintiffs' exclusive rights to the Trademarks, entitling Plaintiffs to an award of treble Defendants' profits, plus attorneys' fees in bringing and maintaining this action, pursuant to 15 U.S.C. § 1117(b), or alternatively statutory damages pursuant to 15 U.S.C. § 1117(c).

## SECOND CAUSE OF ACTION
**(Federal Unfair Competition and False Designation of Origin (15 U.S.C. § 1125(a) and Federal Trademark Dilution (15 USC § 1125(c))**

64. Plaintiffs repeat and reallege each allegation set forth in the above paragraphs as if set forth fully herein.

65. Plaintiffs have used their inherently distinctive Trademarks to identify officially authorized goods and services and to distinguish the Knicks from other professional sports teams. Plaintiffs have, among other things, prominently displayed the Trademarks in advertising and promotional materials and on merchandise, including the Sports Merchandise. Plaintiffs have realized, and expect to realize, substantial income from the sale of Sports Merchandise bearing the Trademarks, and thousands of such items have been sold in the vicinity of the MSG Arena before, during, and after the Knicks' home games (and, at least in the case of the 2026 NBA Playoffs, even during watch parties at or around MSG Arena during Knicks away games).

66. As a result of the foregoing, Plaintiffs' Trademarks have developed and now possess secondary and distinctive meaning to purchasers of the Sports Merchandise.

67. The Knicks have achieved wide renown during their respective tenures in the NBA.

The Trademarks have been used in interstate commerce on and for the purpose of identifying, among other things, the Sports Merchandise, including T-shirts and other apparel.

68. As such, Trademarks are famous, highly distinctive, of incalculable value, and universally associated in the public mind with authentic merchandise upon which the Trademarks appear.

69. The Knicks have a decidedly strong and loyal following among sports fans.

70. The Knicks have played, and will play, home games at the MSG Arena during the 2026-2027 Season, most of which games will sell out.

71. Plaintiffs have and intend to continue to sell Sports Merchandise at the MSG Arena before, during, and after these games.

72. Upon information and belief, Defendants have engaged, and will continue to engage, in the unauthorized manufacture, distribution and sale of inferior Bootleg Merchandise bearing the Trademarks in the vicinity of the MSG Arena during the 2026-2027 Season.

73. The Bootleg Merchandise is of the same general appearance as the Sports Merchandise and is likely to confuse prospective purchasers as to the source or sponsorship of such Bootleg Merchandise.

74. The Bootleg Merchandise is generally of inferior quality as compared to the Sports Merchandise.

75. The sale of such merchandise is likely to injure the reputation of Plaintiffs and the Knicks, who have developed, including by virtue of the Knicks' performances and success (including winning the 2026 NBA Championship), the reputation for high quality associated with the Sports Merchandise.

76. The manufacture, distribution and sale of Bootleg Merchandise by Defendants, and

those acting in concert with Defendants, constitutes a false designation of the source of origin of such goods and falsely describes and represents such merchandise, in violation of Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)).

77. In addition, the Trademarks are famous within the meaning of the Trademark Dilution Revision Act of 2006 because (a) the Trademarks are highly distinctive, (b) Plaintiffs have used the Trademarks continuously for decades to promote Plaintiffs' goods and services, (c) Plaintiffs have advertised and publicized the Trademarks for decades, (d) the Trademarks are widely recognized by the general consuming public, and (e) the Trademarks are the subject of valid and subsisting incontestable registrations on the Principal Register of the United States Patent and Trademark Office.

78. Defendants' use of the Trademarks began only after such marks became famous.

79. The manufacture, distribution, and sale of Bootleg Merchandise by Defendants, and those acting in concert with Defendants, thus constitutes dilution by tarnishment in violation of Section 43(c) of the Lanham Act (15 U.S.C. § 1125(c)).

80. Indeed, the aforesaid acts by Defendants, and those acting in concert with Defendants, are likely to cause confusion or mistake and/or to deceive, and are likely to cause the purchasing public to believe that the sale of such Bootleg Merchandise is authorized, sponsored or approved by Plaintiffs, and that such Bootleg Merchandise is subject to the same quality control and regulation required by Plaintiffs.

81. The use by Defendants and others of the Trademarks constitutes an attempt to palm off and appropriate to themselves Plaintiffs' exclusive rights therein.

82. Upon information and belief, Defendants, and those acting in concert with Defendants, have engaged, and will continue to engage, in such unauthorized activities in the

vicinity of the MSG Arena and elsewhere in interstate commerce and, unless enjoined, are likely to continue such activities throughout the Knicks' 2026-2027 Season.

83. Plaintiffs have no adequate remedy at law and have suffered, and will continue to suffer, irreparable harm and damage as a result of Defendants' aforesaid acts, which, if not enjoined, will cause injury and monetary loss in an amount presently incalculable.

**THIRD CAUSE OF ACTION**
**(Unfair Competition)**

84. Plaintiffs repeat and reallege each allegation set forth in the above paragraphs as if set forth fully herein.

85. Upon information and belief, the aforesaid acts by Defendants and others acting in concert with Defendants have been, and will continue to be, committed with full knowledge of the rights of Plaintiffs, and have the effect of misleading and confusing the public and misappropriating and trading upon the property rights, goodwill and reputation inhering to Plaintiffs and the Knicks.

86. Such misappropriation and unfair competition will interfere with Plaintiffs' rights and ability to exploit the commercial value of the Trademarks.

87. Plaintiffs have no adequate remedy at law and have suffered, and will continue to suffer, irreparable harm and damages as a result of Defendants' aforesaid acts, which, if not enjoined, will cause injury and monetary loss in an amount presently incalculable.

**FOURTH CAUSE OF ACTION**
**(Violation of New York Business Law § 349)**

88. Plaintiffs repeat and reallege each allegation set forth in the above paragraphs as if set forth fully herein.

89. Plaintiffs' claim hereunder arises under the New York Business Law § 349.

90. The aforesaid acts by Defendants constitute unconscionable commercial practices, deception, fraud, and misrepresentation in connection with the sale of merchandise in violation of § 349 of the New York Business Law.

91. Plaintiffs have no adequate remedy at law and have suffered, and will continue to suffer, irreparable harm and damage as a result of Defendants' aforesaid acts, which, if not enjoined, will cause injury and monetary loss in an amount presently incalculable.

## PRAYER FOR RELIEF

**WHEREFORE, Plaintiffs seek relief as follows:**

1. Defendants, their agents, servants, employees, officers, attorneys, successors, and assigns, and all persons acting in concert with Defendants, or on their behalf, be enjoined, preliminarily during the course of this litigation and permanently during the 2026-2027 Season, from:

   (a) Manufacturing, distributing, selling, offering for sale, holding for sale or advertising any products bearing the Trademarks or any colorable variation thereof, including, but not limited to, the Knicks name; and

   (b) Representing that any article of merchandise manufactured, distributed, sold, held for sale or advertised by Defendants is sponsored or authorized by Plaintiffs.

2. That this Court authorize the United States Marshal, the local and state police, authorized agents of Plaintiffs, and/or any persons acting under their supervision, to seize and impound any and all Bootleg Merchandise which Defendants may attempt to sell, distribute or hold for sale at, within, or in the vicinity of the MSG Arena, before, during or after the Knicks' games during the 2026-2027 Season.

3. That Defendants deliver up for destruction all Bootleg Merchandise bearing the

Trademarks.

4. That Defendants pay to Plaintiffs damages in an amount to be determined based upon Plaintiffs' loss of income from Defendants' unauthorized activities.

5. That Defendants pay to Plaintiffs treble damages, costs and attorneys' fees pursuant to 15 U.S.C. § 1117.

6. That Plaintiffs have such other and further relief as the Court deems to be reasonable, necessary and just.

CHIESA SHAHINIAN & GIANTOMASI PC

Dated: November 5, 2026

By: *<u>/s/ Melissa A. Salimbene</u>*

Melissa A. Salimbene
11 Times Square, 34th Floor
New York, NY 10036
Telephone: (973) 530-2092
Facsimile: (973) 325-2292
msalimbene@csglaw.com
*Attorneys for Plaintiffs*
*MSG Knicks, LLC and*
*New York Knicks, LLC*

**SCHEDULE A - NEW YORK KNICKS, LLC FEDERAL REGISTRATIONS AND APPLICATIONS**

***Federal Registrations***

| Mark | Reg. No. | Reg. Date | Goods/Services |
|---|---|---|---|
| **NEW YORK KNICKS** | 3,035,311 | 12/27/2005 | Class 25 - Clothing, namely hosiery, footwear, basketball shoes, basketball sneakers, T-shirts, shirts, polo shirts, sweatshirts, sweatpants, pants, tank tops, jerseys, shorts, pajamas, sport shirts, rugby shirts, sweaters, belts, ties, nightshirts, hats, caps, visors, warm-up suits, warm-up pants, warm-up tops/shooting shirts, jackets, wind resistant jackets, parkas, coats, baby bibs not of paper, head bands, wrist bands, aprons, undergarments, boxer shorts, slacks, caps, ear muffs, gloves, mittens, scarves, woven and knit shirts, jersey dresses, dresses, cheerleading dresses and uniforms, swim wear, bathing suits, swimsuits, swim trunks, bathing trunks, board shorts, bathing suit cover-ups, sandals, beach sandals, beach hats, sun visors, novelty headwear with wigs |

| Mark | Reg. No. | Reg. Date | Goods/Services |
|---|---|---|---|
| **KNICKS** | 5,103,173 | 12/20/2016 | Class 25 - Clothing, namely, hosiery, footwear, basketball shoes, basketball sneakers, slippers, T-shirts, shirts, polo shirts, sweatshirts, sweatpants, pants, tank tops, jerseys, shorts, pajamas, sport shirts, rugby shirts, sweaters, belts, ties, nightshirts, hats, caps, visors, warm-up suits, warm-up pants, warm-up tops/shooting shirts, jackets, wind resistant jackets, parkas, coats, baby bibs not of paper, head bands, wrist bands, aprons, undergarments, boxer shorts, slacks, ear muffs, gloves, mittens, scarves, woven and knit shirts, jersey dresses, dresses, cheerleading dresses and uniforms, swim wear, bathing suits, swimsuits, bikinis, tankinis, swim trunks, bathing trunks, board shorts, beach cover-ups, bathing suit cover-ups, bathing suit wraps, sandals, beach sandals, beach hats, sun visors, swim caps, bathing caps |
| | 4,171,079 | 7/10/2012 | Class 25 - Clothing, namely, hosiery, footwear, basketball shoes, basketball sneakers, T-shirts, shirts, polo shirts, sweatshirts, sweatpants, pants, tank tops, jerseys, shorts, pajamas, sport shirts, rugby shirts, sweaters, belts, ties, nightshirts, hats, caps, visors, warm-up suits, warm-up pants, warm-up tops/shooting shirts, jackets, wind resistant jackets, parkas, coats, baby bibs not of paper, head bands, wrist bands, aprons, undergarments, boxer shorts, slacks, ear muffs, gloves, mittens, scarves, woven and knit shirts, jersey dresses, dresses, cheerleading dresses and uniforms, swim wear, bathing suits, swimsuits, bikinis, tankinis, swim trunks, bathing trunks, board shorts, bathing suit wraps, sandals |

| Mark | Reg. No. | Reg. Date | Goods/Services |
|---|---|---|---|
| | 4,708,834 | 3/24/2015 | Class 16 - Publications and printed matter, namely, stickers, decals, ball point pens, unmounted and mounted photographs, posters, and bumper stickers |
| | 4,786,325 | 8/4/2015 | Class 18 - Athletic bags, shoe bags for travel, overnight bags, backpacks, baby backpacks, knapsacks, duffel bags, tote bags, beach bags, beach tote bags, drawstring pouches, luggage, valises, book bags, all purpose sports bags, gym bags, purses, coin purses, cosmetic cases sold empty, handbags, toiletry cases sold empty, pet clothing |
| | 4,187,699 | 8/7/2012 | Class 25 - Clothing, namely, hosiery, footwear, basketball shoes, basketball sneakers, T-shirts, shirts, polo shirts, sweatshirts, sweatpants, pants, tank tops, jerseys, shorts, pajamas, sport shirts, rugby shirts, nightshirts, hats, caps, jackets, wind resistant jackets, coats, undergarments, boxer shorts, scarves, woven and knit shirts, jersey dresses, dresses, sandals, beach sandals, beach hats |

| Mark | Reg. No. | Reg. Date | Goods/Services |
|---|---|---|---|
| KNX KNICKS GAMING | 6,834,116 | 8/30/2022 | Class 25 - Clothing, namely, hosiery, footwear, basketball shoes, basketball sneakers, T-shirts, shirts, polo shirts, sweatshirts, sweatpants, pants, tank tops, jerseys, shorts, pajamas, sport shirts, rugby shirts, sweaters, belts, ties, nightshirts, hats, caps being headwear, visors being headwear, beanies, warm-up suits, warm-up pants, warm-up tops, shooting shirts, jackets, wind resistant jackets, parkas, coats, baby bibs not of paper, head bands, wrist bands, aprons, undergarments, boxer shorts, slacks, ear muffs, gloves, mittens, scarves, woven and knit shirts, jersey dresses, dresses, cheerleading dresses and uniforms, swim wear, bathing suits, swimsuits, bikinis, tankinis, swim trunks, bathing trunks, board shorts, wet suits, beach cover-ups, bathing suit cover-ups, bathing suit wraps, sandals, beach sandals, beach hats, sun visors being headwear, swim caps, bathing caps, novelty headwear with attached wigs; all of the foregoing in connection with the field of basketball, electronic games, electronic sports and virtual sports |

| Mark | Reg. No. | Reg. Date | Goods/Services |
|---|---|---|---|
| | 2,482,689 | 8/28/2001 | Class 16 - Publications and printed matter, namely, basketball trading cards, entertainment trading cards, stickers, decals, post cards, note cards, memo pads, ball point pens, pencils, 3-ring binders, stationery folders, wirebound notebooks, portfolio notebooks, unmounted and mounted photographs, posters, calendars, bumper stickers, book covers, wrapping paper, statistical books, guide books and reference books for basketball, magazines in the field of basketball, commemorative game programs, paper pennants, stationery, stationery-type portfolios, and statistical sheets for basketball topics, newsletters and pamphlets in the field of basketball for distribution to the television and radio media |
| | 2,300,551 | 12/14/1999 | Class 25 - Clothing, namely, hosiery, footwear, T-shirts, sweatshirts, sweatpants, pants, tank tops, jerseys, shorts, sport shirts, sweaters, belts, ties, hats, warm-up suits, jackets, parkas, slacks, caps |
| | 4,099,181 | 2/14/2012 | Class 28 - Toys, namely, dolls, decorative dolls, collectible dolls, toy action figures, bobblehead action figures, stuffed toys, plush toys, pet toys |
| | 1,988,809 | 7/23/1996 | Class 25 - clothing; namely, hosiery, footwear, T-shirts, sweat shirts, sweatpants, pants, tank tops, jerseys, shorts, pajamas, sport shirts, sweaters, belts, ties, hats, warm-up suits, jackets, , head bands and wrist bands |

| Mark | Reg. No. | Reg. Date | Goods/Services |
|---|---|---|---|
| | 1,768,640 | 5/4/1993 | Class 16 - publications and printed matter; namely, basketball trading cards, stickers, decals, commemorative basketball stamps, post cards, note cards, memo pads, ball point pens, pencils, unmounted photographs, posters, calendars, bumper stickers, book covers, wrapping paper, statistical books, guide books and reference books for basketball, commemorative game programs, paper pennants, stationery portfolios, and statistical sheets, newsletters and pamphlets for distribution to the television and radio media<br><br>Class 25 - clothing; namely, hosiery, footwear, T-shirts, sweat shirts, sweatpants, pants, tank tops, jerseys, shorts, pajamas, sport shirts, rugby shirts, sweaters, belts, nightshirts, hats, warm-up suits, jackets, parkas, coats, cloth bibs, head bands and wrist bands<br><br>Class 28 - toys and sporting goods; namely, golf balls, playground balls, sports balls, rubber action balls and foam balls, basketball nets, basketball backboards, basketballs, basketball pumps, golf clubs, golf bags, computerized basketball table games, video game cartridges, basketball table top games, basketball board games, basketball kit comprising a basketball net, whistle, basketball pump and needle therefor, dolls, stuffed toys, jigsaw puzzles and Christmas tree ornaments<br><br>Class 41 - entertainment services in the nature of basketball games and basketball exhibitions rendered live in stadia and through the media of radio and television broadcasts |

| Mark | Reg. No. | Reg. Date | Goods/Services |
|---|---|---|---|
| | 2,197,935 | 10/20/1998 | Class 18 - athletic bags, shoe bags for travel, overnight bags, umbrellas, backpacks, baby backpacks, duffel bags, tote bags, luggage, luggage tags, patio umbrellas, valises, attache cases, billfolds, wallets, briefcases, canes, business card cases, book bags, all purpose sports bags, golf umbrellas, gym bags, purses, fanny packs, waist packs, cosmetic cases sold empty, garment bags for travel, handbags, key cases, knapsacks, suitcases, toiletry cases sold empty and trunks for traveling |
| | 4,099,180 | 2/14/2012 | Class 25 - Clothing, namely hosiery, footwear, basketball shoes, basketball sneakers, T-shirts, shirts, polo shirts, sweatshirts, sweatpants, pants, tank tops, jerseys, shorts, pajamas, sport shirts, rugby shirts, sweaters, belts, ties, nightshirts, hats, caps, visors, warm-up suits, warm-up pants, warm-up tops/shooting shirts, jackets, wind resistant jackets, parkas, coats, baby bibs not of paper, head bands, wrist bands, aprons, undergarments, boxer shorts, slacks, ear muffs, gloves, mittens, scarves, woven and knit shirts, jersey dresses, dresses, cheerleading dresses and uniforms, swim wear, bathing suits, swimsuits, bikinis, tankinis, swim trunks, bathing trunks, board shorts, wet suits, beach cover-ups, bathing suit cover-ups, bathing suit wraps, sandals, beach sandals, beach hats, sun visors, swim caps, bathing caps, novelty headwear with attached wigs |

| Mark | Reg. No. | Reg. Date | Goods/Services |
|---|---|---|---|
| | 2,563,428 | 4/23/2002 | Class 35 - Computerized on-line store, ordering, retail, electronic retailing, catalog and mail order catalog services featuring audio recordings; video recordings; computer accessories; computer games; computer software; computer databases; video games; telephones; binoculars; eyewear; magnets; collectible and novelty items; collectible coins; medallions; albums; scrapbooks; photo frames; sports memorabilia; timepieces; jewelry; jewelry boxes; credit cards; calling cards; publications; calendars; catalogs; organizers; directories; stationery; school supplies; giftware; gift sets; portfolios; posters; photos; trading cards; books; card holders; pamphlets; pennants; flags; banners; souvenirs; catalogs; bank checks; bags; travel bags; travel cases; sports bags; lunch boxes; wallets; umbrellas; clothing; toys; games; sporting goods; Christmas ornaments; decorations; housewares; lamps; lighting fixtures; beveragewear; kitchenware; household supplies; containers; boxes; bed, bath and table linens; furniture, office furniture and accessories; lockers and footlockers |
|  | 2,188,043 | 9/8/1998 | Class 25 – Clothing, namely jerseys and shorts |
| | 2,856,171 | 6/22/2004 | Class 25 - Clothing, namely, hosiery, footwear, T-shirts, sweatshirts, sweat pants, pants, tank tops, jerseys, shorts, sport shirts, rugby shirts, sweaters, nightshirts, hats, jackets, parkas, coats, boxer shorts, caps, woven and knit shirts |
| **KNICKERBOCKERS** | 866,661 | 3/11/1969 | Class 41 – professional basketball contests |

***Federal Applications***

| Mark | Serial No. | App. Filing Date | Goods |
|---|---|---|---|
| | 99/888,871 | 6/16/2026 | Class 14 - Jewelry; Costume jewelry; Rubber or silicone wristbands in the nature of a bracelet; Earrings; Necklaces; Rings being jewelry; Bracelets; Cuff links; Pendants; Ornamental lapel pins; Pins being jewelry; Jewellery charms; Clocks; Watches; Watch bands and straps; Tie clips; Medallions; Non-monetary coins; Key chains; Key rings; Lanyards for holding keys; Figures of precious metal; Figurines of precious metal; Trophies of precious metals |
| | 99/888,889 | 6/16/2026 | Class 14 - Jewelry; Costume jewelry; Rubber or silicone wristbands in the nature of a bracelet; Earrings; Necklaces; Rings being jewelry; Bracelets; Cuff links; Pendants; Ornamental lapel pins; Pins being jewelry; Jewellery charms; Clocks; Watches; Watch bands and straps; Tie clips; Medallions; Non-monetary coins; Key chains; Key rings; Lanyards for holding keys; Figures of precious metal; Figurines of precious metal; Trophies of precious metals |
| | 50/133,656 | 9/28/2026 | Class 20 - Pillows; Seat cushions; Plastic key tags; Plastic key chain tags; Picture frames; Decorative mirrors; Wall plaques made of plastic or wood; Soft sculpture wall decorations; Wooden signboards; Decorative mobiles; Furniture; Trophies of plastic; Display cases; Display stands; Figurines of plastic; Non-metal pet tags; Wood boxes; plastic novelty license plate frames; plastic novelty license plates; non-metal name plates; figurines of plastic in the nature of garden gnomes; pillows for household pets; beds for household pets |

| | | | |
|---|---|---|---|
| | 50/133,669 | 9/28/2026 | Class 21 - Beverageware; Wastepaper baskets; Water bottles sold empty; Jugs; Souvenir plates; Paper plates; Glass jars; Cooking utensils, namely, grill covers; Spatulas for kitchen use; Barbecue tongs; Non-electric portable beverage coolers; Coasters, not of paper or textile; Lunch boxes; Insulated lunch bags; Bottle openers; Salt and pepper shakers; Drinking flasks; Insulating sleeve holder for bottles; Insulating sleeve holders for beverage cans; Laundry hampers for domestic or household use; Bottle stoppers specially adapted for use with wine bottles; Corkscrews; Figurines of ceramic and fiberglass in the nature of garden gnomes; Oven mitts; Baskets for household purposes; Cookery molds; Decanters |
| | 50/133,697 | 9/28/2026 | Class 24 - Cloth banners; Textile wall hangings; Cloth flags; Cloth pennants; Plastic pennants; Household linen; Bed blankets; Lap blankets; Baby blankets; Blankets for outdoor use; Blanket throws; Curtains; Towels; Tablecloths, not of paper; Textile place mats; Cloth handkerchiefs; Unfitted fabric furniture covers; Shower curtains; Sleeping bags; Cloth coasters |